# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50055 | **DATE** | 2/11/2003 |
| **CASE TITLE** | Morgan-Burt vs. Barnhart | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached memorandum opinion and order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | FEB 13 2002 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 2/11/2003 | | |
| | | | date mailed notice | | |
| sp | courtroom deputy's initials | | sp | | |
| | | Date/time received in central Clerk's Office | docketing deputy initials | | |

CLERK, U.S. DISTRICT COURT

FEB 12 PH 3: 26

FILED-WD

# United States District Court
## Northern District of Illinois
### Western Division

CAROL MORGAN-BURT

**JUDGMENT IN A CIVIL CASE**

v.

Case Number: 02 C 50055

JO ANNE BARNHART

☐     Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■     Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff's motion for summary judgement is denied. Summary judgment entered in favor of the defendant and against the plaintiff.

Michael W. Dobbins, Clerk of Court

Date: 2/12/2003

Gale L. Graeff, Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

CAROL MORGAN-BURT,                    )
                                      )
    Plaintiff,                     )      Case No. 02 C 50055
                                      )
    v.                             )      Magistrate Judge
                                      )      P. Michael Mahoney
JO ANNE B. BARNHART,                  )
COMMISSIONER OF SOCIAL                )
SECURITY,                             )
                                      )
    Defendant.                     )

## MEMORANDUM OPINION AND ORDER

Carol Morgan-Burt, ("Plaintiff"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on April 30, 2002. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for DIB on July 27, 2000, alleging disability on June 5, 1999. (Tr. 57). Plaintiff's application for benefits was denied on September 26, 2000. (Tr. 25-28). On October 3, 2000, Plaintiff filed a request for reconsideration. (Tr. 29). Plaintiff's request for reconsideration was denied on March 9, 2001. (Tr. 30-32). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on March 30, 2001. (Tr. 33). Plaintiff appeared, with counsel, before an ALJ on July 26, 2001. (Tr. 236). In a decision dated August 17, 2001, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 22). On August 27, 2001, Plaintiff requested a review of the

ALJ's decision by the Appeals Council. (Tr. 9). On January 16, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 6).

## II.    **FACTS**

Plaintiff was born on October 22, 1961, (tr. 57), and was thirty-nine years old at the time of her July 2001 hearing. (Tr. 236). According to her own testimony, Plaintiff completed high school by attending night school. (Tr. 239). At the time of the hearing, Plaintiff, married with no children, was living with her husband. (*Id.*).

Plaintiff worked as an instrument technician in a hospital from May 1987 to December 1997. (*Id.*). Plaintiff was promoted to surgical technician in December 1997. (Tr. 85). Plaintiff worked as a surgical technician until June 1999. (*Id.*). Plaintiff left her job as a surgical technician in June 1999 because of an altercation between her and one of the surgeons. (Tr. 240). According to Plaintiff, she was verbally assaulted by this surgeon over the course of weeks and months. (*Id.*). Although she could not remember specifics, Plaintiff stated that the surgeon would say things like "you're not meant for this job," and "you cannot even cut this." (Tr. 241).

When asked by the ALJ if Plaintiff could return to her job as an instrument technician Plaintiff responded she could not return because "It's a step backwards." (Tr. 241). When asked by the ALJ, that even though it was a step backwards, whether Plaintiff could perform the job of an instrument technician, Plaintiff responded "I don't think so[,]" because "I can't focus as well as I could then. I have anxiety attacks and they're very exhausting." (*Id.*). However, when asked about these anxiety attacks by the ALJ, Plaintiff revealed she had them during her last few months as an instrument technician and she was able to work with them. (Tr. 242). Later, during her testimony, Plaintiff stated her anxiety was not stress related but rather because Plaintiff "can't cope," as a result

2

of being depressed almost her whole life. (Tr. 247-248). However, when asked by the ALJ how often Plaintiff missed work as an instrument technician, Plaintiff testified six or seven times a year,(tr. 248), and she had never been written up for absenteeism or tardiness. (Tr. 249). As a surgical technician, Plaintiff stated she missed six days of work in two months but was still not written up. (*Id.*).

When asked if Plaintiff could work at a different job, one that would not require stress, such as a janitor or a hotel cleaner, Plaintiff stated she could not because she does not "take orders well." (*Id.*). When informed that a hotel cleaner would probably have little contact with supervisors and coworkers, Plaintiff testified that she could not be a hotel cleaner because she does not even care enough to clean her own house. (Tr. 243). When asked about possibly working at an assembly job or as a cashier, Plaintiff stated, as to assembly, she is too clumsy, and as to a cashier, Plaintiff stated she is not good with math. (*Id.*). Again, when informed by the ALJ that as a cashier Plaintiff would generally not need to know math, Plaintiff stated "[p]eople make me nervous." (*Id.*).

Plaintiff stated, when her depression or anxiety begins, she gets palpitations and shaky and she starts to function on auto-pilot and not know what is going on around her. (Tr. 251). According to Plaintiff, these symptoms occur four times a week. (*Id.*). When the symptoms came, Plaintiff stated she had to "ride them out[,]" and stay away from people. (*Id.*). When asked how long the symptoms last, Plaintiff stated "[t]hey've lasted anywhere from a couple minutes to all day long." (Tr. 252).

On a regular day, Plaintiff stated "I watch TV. If I feel good enough I read. Play video game[,]" and cook supper. (Tr. 253). Plaintiff stated her husband does most of the house cleaning such as vacuuming, sweeping, mopping, and dusting, but Plaintiff does the dishes and sometimes

3

the laundry (*Id.*). Plaintiff stated she is able to dress and bathe herself but about four times a week Plaintiff does not bathe or dress herself. (Tr. 253-254). On those days, Plaintiff stated all she does is watch TV and occasionally cook meals. (Tr. 254). Finally, when asked by the ALJ, Plaintiff testified she does not: go to movies, go to any religious services, exercise, go out with friends, or go out socially with her husband. (*Id.*).

Finally, Plaintiff thinks of suicide once or twice a week. (Tr. 256). However, she has no plans or intentions to carry out her thoughts. (Tr. 257). Nonetheless, Plaintiff did testify that she gets urges, and sometimes follows through with them, to hurt herself by slamming herself into a wall or hitting herself in the head. (*Id.*). When asked when was the last time she hurt herself, Plaintiff stated about a month prior to her hearing. (*Id.*). Plaintiff has never been hospitalized as a result of these actions against herself. (*Id.*).

Medical expert, Gerald Hoffman,[1] appeared before the ALJ at Plaintiff's July 2001 hearing. (Tr. 259). Dr. Hoffman began his examination of Plaintiff by asking her to more fully describe her anxiety. (Tr. 260). Plaintiff stated that she feels extremely nervous and anxious and really scared of what is going to happen next. (*Id.*). In fact, Plaintiff stated, when asked by Dr. Hoffman, that she felt anxious during her hearing, although her level of anxiety was less than what it had been in the past.[2] (Tr. 261).

The source of Plaintiff's anxiety is unknown. Plaintiff stated that two-thirds of the time her anxiety comes on for no reason. (Tr. 262). However, as to the other one-third, Plaintiff stated she

---

[1] Plaintiff stipulated to Dr. Hoffman's qualifications as an expert in psychiatry. (Tr. 260).

[2] Plaintiff stated at its worst, her anxiety prevents her from being able to speak or answers questions. (Tr. 261).

can identify the source such as going to see her mother-in-law in a nursing home, because going to nursing homes brings on "panic attacks" for Plaintiff. (*Id.*). When asked by Dr. Hoffman whether Plaintiff used panic attack in the same way she used the word anxiety, Plaintiff stated "I guess it's the same." (Tr. 263). In terms of her depression, Plaintiff stated "I feel hopeless, and I actually think the whole world's pretty hopeless. I, when thinking of things I have to do or something, I get depressed and I can't, can't cope with things very well." (*Id.*). Additionally, Plaintiff stated she thinks about the past and her failure at her job,(*id.*), and how she is different from other people in that she does not want children or a house with a picket fence. (Tr. 266).

When further asked by Dr. Hoffman, Plaintiff testified that she likes to eat (which she does when she is anxious) but does not like to make love. (Tr. 267). Additionally, Plaintiff stated she does not sleep well because she has nightmares. (*Id.*). These nightmares usually involved the hospital, certain doctors, and Plaintiff being laughed at by her fellow coworkers or being yelled at by certain doctors for messing up. (*Id.*). Plaintiff eventually wakes from these nightmares feeling upset and scared of failure. (Tr. 268).

Dr. Hoffman ultimately found Plaintiff had impairments. (Tr. 270). Specifically, Dr. Hoffman stated "I believe there is an impairment, certainly a long standing affective disorder. There's a sleep disturbance, decreased energy, certainly feelings of worthlessness and guilt that she's had for quite some time." (*Id.*). Additionally, Dr. Hoffman found that Plaintiff had:

> an anxiety problem as well. Apparently there was motor tension in
> autonomic hyperactivity. Some problems in vigilance. She [sic]
> describing out of body experiences which show me there's
> derealization and is a syptom of anxiety and derealization meaning the
> world doesn't seem quite real. Depersonalization means that one's
> own, one is I have, one is out of one's own self is not quite real, and
> she was describing depersonalization when she describes these

5

disassociated experiences or out of body feelings that she mentioned before. So we have motor tension, autonomic hyperactivity with the shakiness, and the palpitations, and the sweating, and there is some problems that she's having with being apprehensive about what may or may not occur, and difficulties with the vigilance in being able to maintain herself, and state of being with the world so to speak.

Tr. (275-276). Dr. Hoffman continued his assessment by addressing the medications that Plaintiff

was taking at the time of the hearing:

Hoffman:       I don't know what you - - you've been in therapy a long time and it's hard to know what - - all they give you is medication. I don't know what you've been told about how to get rid of or how to deal with these symptoms in some, you know, behavior modification or some kind of cognitive approach. Medicines often given in the, instead of being taught how to cope with your anxieties. And the medicines that you're taking Celexa, which is an anti-depressant, and an anti-anxiety medicine, Neurontin for mood regulation. I think they stopped that. Didn't they, Neurontin?

Plaintiff:        No

Hoffman:       They didn't. Seraquel is an anti-psychotic medication. I'm not sure why you're being given that.

Plaintiff:        I don't know, but it's better.

Hoffman:       Huh?

Plaintiff:        It helps more then - -

Hoffman:       It helps?
...
Hoffman:       It does? Yeah. Okay. Fair enough. But it does help, and you said it helps how much? Fifty percent? Eighty?

Plaintiff:        I don't know. Fifty percent more.
...
Hoffman:       Now would you say that you're 50 percent better, 80

6

|            |                                                                                                      |
| ---------- | ---------------------------------------------------------------------------------------------------- |
|            | percent better, 20 percent better?                                                                   |
| Plaintiff: | Twenty                                                                                               |
| Hoffman:   | So it's not really doing that much, is it? That medication all these years.                          |
| Plaintiff: | Well I, I've only been on it, well Seraquel, I've only been on it for about four or five months I think. |
| Hoffman:   | That is a long time.                                                                                 |

(Tr. 276-277). After this exchange with Plaintiff, Dr. Hoffman resumed his assessment of Plaintiff's

impairments as originally asked by the ALJ:

> Well she did, as I said, with the anxiety disorders we have some recurrent attacks of what she describes as panic. Now I make a distinction between reactive anxiety, which is anxiety that comes anticipation of doing something about which one may experience anxiety, or having experienced anxiety in the past, or something that is, you know, stressful to her like economic problems or martial problems, or things of that nature, but she seems to be describing some kind of anxiety that comes out of the blue.
>
> …
>
> Now that should be helped with the medicine she's taking, but she says its only 20 percent. You also have not been given major or a minor tranquilizer to raise the threshold of the anxiety neurons in your brain. That has not, that has not been done. But never the less, she would meet the anxiety related disorders, that's being 1206.

(Tr. 277-278). Once Dr. Hoffman determined that Plaintiff would meet the anxiety related disorders

of §1206, the ALJ directed Dr. Hoffman to look at the "B criteria" to determine whether Plaintiff

fulfilled those as well. Dr. Hoffman first considered activities of daily living.

| Hoffman: | B criteria. Now if she doesn't go anywhere and stays home most of the time, and will go to the grocery store apparently with her husband, but does drive to the store for cigarrettes and stuff, but doesn't go anywhere else. And she says she doesn't have any friends, and she |
| -------- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |

7

|  |  |
|---|---|
|  | doesn't have any relatives around, and she stays home all the time. Right? That's a fairly marked restriction in daily activity, although she can go on the computer and she can, so she can - - what did you say? Do the laundry, the dishes, cooking supper and so forth - - |
| ALJ: | Right. And what are - - |
| Hoffman: | - - so I don't know if that's marked. |
| ... | |
| ALJ: | All right. So what is your opinion then on, under activities of daily living? |
| Hoffman: | I would say moderate. |

(Tr. 279-279). Next, the ALJ asked Dr. Hoffman to evaluate Plaintiff's maintaining social functioning.

|  |  |
|---|---|
| Hoffman: | Well, she describes not going anywhere or doing anything, and she said no social life. |
| ... | |
| Hoffman: | So if she has not social life, well, I'm going to have to say that would be marked restriction. |

(Tr. 279). After social functioning, the ALJ directed Dr. Hoffman to Plaintiff's ability in maintaining concentration, persistence or pace.

|  |  |
|---|---|
| Hoffman: | Well, we're talking about that in the context of completing tasks in a timely manner in a work like setting. We have no work like setting to assess at this time. We only know what happened two years ago. We don't have anything up to date as to whether or not - - now at that time, there was a problem, but now, I don't know. I can't say. She hasn't tried it. |
| Atty: | Excuse me. Isn't, I may be wrong here, but isn't the new, the new 9 of 2000, it doesn't have, it's not specifically related to the work setting. |
| ALJ: | Right. |

...

ALJ:         You would take into factors such as working on the computer for two hours at a time, and even being able to watch TV, or doing other things. Can you give an opinion then based on her testimony, and, and again, it should be on the medical evidence of record as well.

...

Hoffman:     Difficulties in concentration, difficulties in persistence and pace, because of the onset of her anxieties, and the panic and things of that nature, the dis-associative experiences. There are difficulties on those lines, and I would say that they would be marked.

ALJ:         All right. So that's your opinion, doctor, but I don't agree with you on that one.

Hoffman:     Okay.

ALJ:         She is able to function and she is able to work on the computer. There is no evidence, nor any complaints in the file indicating she has any concentration problems. She was able to work for 20 years at a job doing obviously a satisfactory job. I would find her mild to moderate at best in concentration.

(Tr. 280-281). Lastly, the ALJ asked Dr. Hoffman to discuss any episodes of decompensation.

Hoffman:     There was a decompensation in the work setting she was working, and she quit the job. And at the time there was anxiety and there was I would say a preoccupation, mentally, with the trauma, experience of trauma of being slighted, put down - - there's been a fragmentation.

ALJ:         Since the onset date though? I want to know - -

Hoffman:     Since then I haven't seen any - -

(Tr. 281-282). After going over "B criteria" the ALJ directed Dr. Hoffman to give his opinion as to Plaintiff's mental RFC.

9

ALJ: Mr. Hoffman, you have a copy of my RFC. Would you please give me your opinion on what occupational adjustments this claimant would need to make or what limitations she might have?

Hoffman: Well, I believe that she could follow work rules.

ALJ: You could please just give me would she have moderate limitations? And that slight limitations? Marked limitations?

Hoffman: Slight limitations

...

Hoffman: Relation to coworkers, moderate, perhaps. Deal with public, moderate. Judgment, slight. Interaction with supervisors, probably depending on how well they treated her would be moderate to marked. Dealing with work stresses, hard to say. She's certainly had a moderate, you know, problem dealing with work stresses at that time. Functioning independently, she's able to function independently at home and on the computer, and on the going to the store, going to the grocery store. She's able to function independently. Maintaining attention and concentration, I agree with what you were saying, and I was in error before. She can concentrate and pay attention.

...

Hoffman: I don't know how complex the job she had was, but certainly complex instructions, I would say moderate problem. Understanding detailed but not complex, a slight problem. Understanding and remember simple, no problem.

...

Hoffman: Personal appearance, she's, looks, there's no problem. Behaving in an emotionally stable manner, she's done quite well I think today in this setting. I believe there would be a slight to moderate problem. Relating predictably in social situations, there would be a moderate problem. Demonstrated reliability, I would say there would be slight problem.

10

(Tr. 283-284). After Dr. Hoffman finished his opinion, Plaintiff's counsel questioned Dr. Hoffman

about his position change as to Plaintiff's limitation for attention, concentration, and persistence an

pace.

> Atty: So let me just see where - - now, so you've gone all the way from marked back to slight on attention, concentration, and persistence and pace. Originally you said marked. Judge said I disagree with you. I think it's moderate, mild to moderate. Now you say slight.

> Hoffman: I change my opinion in view of the judge's reminding me of the things in the record that I had not known, aware, I hadn't been paying attention to.

> ...

> Atty: The things that you were reminded of?

> Hoffman: Her ability to be on the computer for two hours. Her ability to watch television for extended periods of time. Her ability to drive a car to get cigarettes and come back. Her ability to go to the counseling session and come back. Her ability to be in counseling session and talk to therapist for 45 minutes. Her ability to change therapists from one to another.

(Tr. 284-285).

Vocational expert, Susan Entenberg, appeared before the ALJ at Plaintiff's July 2001 hearing.

(Tr. 288). The ALJ directed Ms. Entenberg to assume an individual "who is 39 years old, has the

work experience and education of claimant, assuming someone who has no exertional limitations,

but is limited to jobs that are low to moderate stress and jobs that are not complex, simple or detailed

being all right." (Id.). Based on the hypothetical, Ms. Entenberg stated such a person could not

perform Plaintiff's past work but could perform other jobs. (Tr. 289-290). Specifically, Ms.

Entenberg stated such a person could work as a packer(4,000 jobs in the Chicago metropolitan area),

11

a hotel housekeeper (20,000 jobs in the Chicago metropolitan area), or an inspector (3,000 jobs in the Chicago metropolitan area). (Tr. 290). Even if the hypothetical were changed to include a person that could have no regular public contact and only incidental contact with coworkers and could endure only low stress jobs, Ms. Entenberg stated the person could still perform the above mentioned jobs. (*Id.*). However, when asked by the ALJ if the hypothetical person was not able to get out of bed and bathe herself at least four times week, Ms. Entenberg stated, as expected, that no jobs exists for a person with such limitations. (Tr. 290-291).

### III.    **MEDICAL HISTORY**

The earliest medical record available to the Magistrate Judge is dated June 18, 1999 (Tr. 133). On this date, Plaintiff saw Dr. Carol Dubois, a staff psychiatrist at the Janet Wattles Center. (*Id.*). Dr. Dubois reported that Plaintiff "often thinks too much when she goes to bed, her appetite has been increased, she has been crying, feeling hopeless, feeling very depressed, overwhelmed. She has increased anxiety." (*Id.*). Contrary to Plaintiff's own testimony, Dr. Dubois indicated Plaintiff "denies suicidal or homicidal ideation." (*Id.*). The report further indicated Plaintiff had been seen by a Dr. Kalweit; however, Plaintiff's medical record before the Magistrate Judge does not include any reports by a Dr. Kalweit. (*Id.*). Dr. Dubois' mental status examination of Plaintiff revealed a "somewhat disheveled looking Caucasian female seated quietly with fair eye contact and cooperative in answering ... questions. She is oriented times three, sensorium is clear, associations are tight." (*Id.*). Dr. Dubois started Plaintiff on Celexa, 20mg daily after supper, and Neurontin, 10 mg. daily. (*Id.*).

Dr. Dubois saw Plaintiff again three days later after Plaintiff spent the weekend in Crisis Beds. (Tr. 132). Dr. Dubois reported Plaintiff stated she is not as depressed but is still anxious and

wants adamantly to go home. Dr. Dubois again reported Plaintiff is not suicidal or homicidal and indicated it appeared Plaintiff had begun to respond to the medication. (*Id.*).

On July 27, 1999, Plaintiff filled out a disability report.[3] (Tr. 75). In the report, Plaintiff indicated her illness was post traumatic stress disorder and bipolar III. (Tr. 76). Plaintiff wrote that her inability to concentrate, a lot of anxiety, panic attacks, depression, and suicidal thoughts limit her ability to work. (*Id.*). Additionally, Plaintiff noted that she was going to start seeing Dr. Gavali of the Manhattan Counseling Center, but the medical record before the Magistrate Judge includes no reports from a Dr. Gavali. (Tr. 83). In regards to Plaintiff's post traumatic stress disorder, Plaintiff wrote this "was caused by persistent verbal abuse at work. I am now unable to deal with any type of criticism. I freeze up when critisized [sic] and become unable to think or do anything." (*Id.*).

Plaintiff saw Dr. Dubois again on July 21, 1999. (Tr. 134). Dr. Dubois's psychiatric progress notes indicated Plaintiff was still struggling with depression but was still not suicidal or homicidal. (*Id.*). Also, Dr. Dubois reported there were unknown issues surrounding Plaintiff's housing and her relationship with her husband. (*Id.*). Dr. Dubois increased Plaintiff's Celexa dosage to 40mg daily and her Neurontin dosage to 1200mg daily. (*Id.*).

About two weeks later, Plaintiff again saw Dr. Dubois on August 6, 1999. (Tr. 137). Dr. Dubois reported that Plaintiff and her husband had been trying to resolve their financial problems and their maxed out credit card problem. (*Id.*). Additionally, Dr. Dubois indicated Plaintiff and her husband were going through with their divorce but were uncertain what to do with their house. (*Id.*).

---

[3] Plaintiff subsequently filled out the same report again on October 27, 2000. (Tr. 104). After comparing the two, the Magistrate Judge finds no significant differences between the two and thus will only discuss the first report.

The report further indicated that the Celexa and Neurontin had helped Plaintiff cope with issues and that Plaintiff was now able to sleep at night. (*Id.*). Dr. Dubois recommended Plaintiff speak to the people who have their mortgage to help with the finances issue. (*Id.*).

Plaintiff again saw Dr. Dubois on August 19, 1999. (Tr. 136). Dr. Dubois reported that Plaintiff had missed several of her group therapy sessions, but that she and her husband decided to get back together. (*Id.*). Dr. Dubois again reported Plaintiff was not suicidal but that she feels she may be better off if she committed suicide. (*Id.*). Dr. Dubois continued Plaintiff on her medication, which Dr. Dubois reported Plaintiff takes faithfully. (*Id.*).

A week after her previous visit with Dr. Dubois, Plaintiff saw Dr. Dubois on August 26, 1999. (Tr. 135). Dr. Dubois reported Plaintiff continued to have trouble with anxiety and has had throughout her life difficulties with pulling her hair out. (*Id.*). Plaintiff indicated to Dr. Dubois that pulling her hair out is an episodic thing and that, on August 26, 1999, Plaintiff was actively engaged in pulling her hair. (*Id.*). Dr. Dubois again noted Plaintiff was not suicidal or homicidal but was very frightened and anxious about returning to work in September. (*Id.*). Dr. Dubois again increased Plaintiff's daily dosage of Celexa to 60mg daily, but left her Neurontin dosage the same. (*Id.*).

About a month after her last August visit with Dr Dubois, Plaintiff saw Dubois on September 24, 1999. (Tr. 138). Dr. Dubois reported Plaintiff had made a commitment to work hard with Richard Parsons.[4] Dr. Dubois reported Plaintiff continued to be anxious but as of September 24, 1999, Plaintiff was still not suicidal or homicidal. (*Id.*).

The next psychiatric progress report by Dr. Dubois is dated May 14, 2000. (Tr. 131). In this

---

[4] This if the first and last time Richard Parsons is mentioned in Plaintiff's medical record. Thus, the Magistrate Judge does not know who Richard Parsons is and what work committment Plaintiff made to him.

report Dr. Dubois reported Plaintiff was working with Colleen Bardel, a counselor, to deal with her anxiety and feelings of being overwhelmed. (*Id.*). Plaintiff continued taking 60mgs of Celexa daily and 400mgs of Neurontin. (*Id.*). However, Plaintiff's dosage of Neurontin was increased by Dr. Dubois to 2400mg daily on July 12, 2000. (Tr. 220). Dr. Dubois indicated she increased the dosage because, although Plaintiff was not suicidal or homicidal, Plaintiff did report she needed something for the anxiety. (*Id.*).

On August 19, 2000, Plaintiff filled out an Activities of Daily Living Questionnaire for the Bureau of Disability Determination Services. (Tr. 93). On this questionnaire, Plaintiff indicated that she cooked meals one to three times a day and that she occasionally cleaned, vacuumed, dusted, and did laundry. (*Id.*). Under the general information section of the questionnaire, in response to whether Plaintiff had any problems concentrating or thinking, Plaintiff wrote she forgets words occasionally and has trouble explaining herself. (Tr. 94). Additionally, Plaintiff wrote she has trouble thinking her way through a problem. (*Id.*). In terms of problems finishing things she starts, Plaintiff wrote "I have problems just getting started doing things, and I forget about them if I am interrupted." (*Id.*). Plaintiff answered "yes" to the question "Do you feel someone is watching or trying to harm you" and wrote "[w]hen I am around people I feel they are watching me and I worry that they might hurt me mentally by messing with my head. I can't stand to have anyone stand behind me." (*Id.*). Finally, in terms of certain activities, Plaintiff indicated that she watched television and paid bills often while she drove and played cards some. (*Id.*). However, Plaintiff rarely or never read, watched children, fixed things, went to sports events, went to church, talked to neighbors, talked on the phone, went out to eat, went to the movies, or went to school. (*Id.*).

On August 28, 2000 Plaintiff saw Dr. Harold Best, a clinical psychologist, of The Counseling

15

Center. (Tr. 143). Dr. Best reported his mental status examination of Plaintiff revealed a neat and well groomed, moderately obese, black haired 38 year old Caucasian. (*Id.*). Plaintiff exhibited normal posture and gait and normal behavior without tics or tremors. (*Id.*). Plaintiff exhibited normal psychomotor activity with no speech disorder present. (*Id.*). Dr. Best reported Plaintiff's mood and affect presented some suggestions of cyclothymic affect, but was otherwise normal and varied. (*Id.*). Plaintiff's thought process was intact, with adequate control of thoughts and normal speed of thoughts. (*Id.*).

Next, Dr. Best evaluated Plaintiff's sensorium and mental capacity into seven separate categories: orientation, memory, information, calculation, abstract thinking, similarities/differences, and judgment and insight. (Tr. 144-145). In terms of orientation, Dr. Best indicated orientation was adequate in that Plaintiff was able to retrace the route she took to arrive at the interview. (Tr. 144). Plaintiff's memory was suspect in that she did not appear to have an intact long term memory. (*Id.*). In terms of information, Dr. Best reported Plaintiff's fund of information was fair to good. (Tr. 145). Plaintiff's calculation skills were fair but her attention and concentration were "off." (*Id.*). Plaintiff's abstract abilities were appropriately developed in that she was able to interpret famous proverbs. (*Id.*). Plaintiff was also able to identify similarities and differences in certain objects. (*Id.*). Lastly, Dr. Best reported Plaintiff's judgment and insight were questionable because Plaintiff indicated she would not know how to get out of a forest in the daytime. (*Id.*). Dr. Best's ultimate diagnosis was Plaintiff suffered from major depressive disorder, recurrent, severe, without features and Trichotillomania. (*Id.*). Additionally, Dr. Best concluded Plaintiff "is depressed– and distressed– but I question her inability to perform substantive employment." (*Id.*).

On September 19, 2000, Dr. E. Kuester, for the Social Security Administration, performed

16

a summary evaluation of Plaintiff's mental residual functional capacity. (Tr. 147-159). In terms of Plaintiff's medical summary, Dr. Kuester reported Plaintiff suffered from affective disorders (§12.04) and anxiety related disorders (§12.06). (Tr. 147). Turning to affective disorders, Dr. Kuester reported Plaintiff suffered from depressive syndrome characterized by sleep disturbance, difficulty concentrating or thinking, and thoughts of suicide. (Tr. 150). Dr. Kuester also reported Plaintiff suffered from Biopolar II. (*Id*.). In terms of anxiety related disorders, Dr. Kuester reported Plaintiff had recurrent obsessions or compulsions which are a source of marked distress and recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. (Tr. 151). Taking the two disorders into account, Dr. Kuester reported Plaintiff's degree of limitation as to activities of daily living was "slight." (Tr. 154). Plaintiff's degree of limitation as to difficulties in maintaining social functioning was "moderate." (*Id*.). Plaintiff's deficiencies of concentration, persistence, or pace, Dr. Kuester reported, was "often." (*Id*.). Finally, Dr. Kuester reported Plaintiff had, once or twice, episodes of deterioration or decompensation in work or work-like settings. (*Id*.).

Next, Dr. Kuester evaluated Plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation in determining Plaintiff's mental residual functioning capacity. (Tr. 156-157). First, in determining Plaintiff's understanding and memory, Dr. Kuester reported that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures or her ability to understand and remember short and simple instructions. (Tr. 156). However, Dr. Kuester reported Plaintiff's ability to understand and remember detailed instructions was moderately limited but not marked. (*Id*.).

Next, in determining Plaintiff's sustained concentration and persistence, Dr. Kuester reported

that Plaintiff was not significantly limited in her ability to: carry out very short and simple instructions, perform activities with a schedule, sustain an ordinary routine without special supervision, or make simple work-related decisions. (*Id.*). Additionally, Dr. Kuester reported that Plaintiff was moderately limited in her ability to: carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with others. (*Id.*). Dr. Kuester reported no marked limitations. (*Id.*).

Third, in determining Plaintiff's ability to socially interact, Dr. Kuester reported that Plaintiff was not significantly limited in her ability to: ask simple questions or request assistance, get along with coworkers or peers without distracting them, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 157). Dr. Kuester also reported that Plaintiff was moderately limited in her ability to: interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. (*Id.*). Again, Dr. Kuester reported no marked limitation. (*Id.*).

Finally, in determining Plaintiff's ability to adapt, Dr. Kuester reported that Plaintiff was not significantly limited in her ability to: respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, set realistic goals or make plans independently of others. (*Id.*). Again, Dr. Kuester reported no marked limitation. (*Id.*).

On September 14, 2000, Robert Hughes[5] filed a report of contact based on Plaintiff's mental

---

[5] It is unclear, based on the report, whether Robert Hughes is or is not a doctor. Because of this, the Magistrate Judge will refer to Robert Hughes as Mr. Hughes.

capacity assessment of August 13, 2000.[6]  (Tr. 97). In his report, Mr. Hughes indicated Plaintiff could not function above the level of unskilled work (which does not require sustained, appropriate interaction with the general public, close supervision, or close cooperation with coworkers) and thus, Mr. Hughes indicated Plaintiff could not perform past work.  (*Id.*).  However, Mr. Hughes nonetheless determined Plaintiff was not disabled. (*Id.*).  As such, Mr. Hughes indicated in his report that there were a significant number of jobs within the occupational base which do not require dealing with the public, close supervision, or close cooperation with coworkers, such as box bender (35, 380 jobs) , drier attendant (14, 604 jobs), and skin lifter (12, 487 jobs).  (*Id.*).

On December 2, 2000, Dr. Donald MacLean, like Dr. Kuester in September 2000, did a psychiatric review of Plaintiff's disorders and evaluated Plaintiff's mental functional capacity. (Tr.167-182).  Unlike Dr. Kuester, Dr. MacLean reported Plaintiff suffered from three disorders: affective disorders (12.04), anxiety-related disorders (12.06), and personality disorders (12.08). (Tr. 167).  Turning to personality disorders,[7] Dr. MacLean reported Plaintiff had inflexible and maladaptive personality traits which cause either significant impairment in social or occupation functioning as evidenced by Plaintiff's pathological dependence, passivity, or aggression. (Tr. 173). Taking the three disorders into account, Dr. MacLean reported Plaintiff's degree of limitation as to activities of daily living was "moderate." (Tr. 179).  Plaintiff's degree of limitation as to difficulties in maintaining social functioning was "moderate."  (*Id.*).  Plaintiff's deficiencies or concentration, persistence, or pace, Dr. MacLean reported, was also "moderate."  (*Id.*).  Finally, Dr. MacLean

---

[6] Marjorie Austin also filed a report of contact on February 21, 2001.  (Tr. 113).  This report is identical to Robert Hughes's report of contact.

[7] The Magistrate Judge is going to skip affective disorders and anxiety-related disorders because both Dr. Kuester and Dr. MacLean reported the same findings.

reported no episodes of decompensation. (*Id.*).

Next, Dr. MacLean evaluated Plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation in determining Plaintiff's mental residual functioning capacity. (Tr. 180-181). First, in determining Plaintiff's understanding and memory, Dr. MacLean reported that Plaintiff was moderately limited in her ability to remember locations and work-like procedures and her ability to understand and remember detailed instructions. (Tr. 180). However, Dr. Kuester reported Plaintiff's ability to understand and remember short and simple instructions was not significantly limited. (*Id.*).

Next, in determining Plaintiff's sustained concentration and persistence, Dr. MacLean reported that Plaintiff was not significantly limited in her ability to: carry out very short and simple instructions, perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or proximity with others without being distracted or make simple work-related decisions. (*Id.*). Additionally, Dr. MacLean reported that Plaintiff was moderately limited in her ability to: carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday without interruption. (Tr. 180-181). Dr. MacLean reported no marked limitations. (*Id.*).

Third, in determining Plaintiff's ability to socially interact, Dr. MacLean reported that Plaintiff was not significantly limited in her ability to: ask simple questions or request assistance, get along with coworkers or peers without distracting them, or maintain socially appropriate behavior. (Tr. 181). Dr. MacLean also reported that Plaintiff was moderately limited in her ability to: interact appropriately with the general public and accept instructions and respond appropriately to criticism from supervisors. (*Id.*). Again, Dr. MacLean reported no marked limitation. (*Id.*).

20

Finally, in determining Plaintiff's ability to adapt, Dr. MacLean reported that Plaintiff was not significantly limited in her ability to: be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, set realistic goals or make plans independently of others. (*Id.*). However, Dr. MacLean also reported that Plaintiff was markedly limited in her ability to respond appropriately to changes in the work setting. (*Id.*).

On December 19, 2000, J.V. Rizzo, Ph.D., a medical consultant, filed a case analysis discussing Plaintiff's disorders. (Tr. 180). Mr/Mrs. Rizzo concluded that "[f]ile evidence does not establish the presence of disabling mental limitations." (Tr. 181). Additionally, Mr/Mrs. Rizzo noted inconsistences between the C/E report and comments from the treating source. (*Id.*). The report noted Plaintiff's behavior at C/E, in treatment, and in ADL reports did not establish severity levels precluding performances of simple tasks. (*Id.*). Ultimately, Mr./Mrs. Rizzo recommended additional development to resolve the noted inconsistencies. (*Id.*).

Plaintiff saw Dr. Dubois again on December 28, 2000. (Tr. 222). According to Dr. Dubois's report, Plaintiff ran out of Neurontin and money to pay for more Neurontin. (*Id.*). Additionally, Dr. Dubois noted that Plaintiff's mood swings were more prevalent but that her depression was better. (*Id.*). Because Plaintiff's financial situation prevented her from getting more Neurontin, Dr. Dubois attempted to get Plaintiff Topamax, 25mg daily. (*Id.*).

On February 21, 2001, Dr. D. G. Hudspath, like Dr. Donald MacLean in December 2000 and Dr. Kuester in September 2000, performed a psychiatric review of Plaintiff's disorders and evaluated Plaintiff's mental functional capacity. (Tr/ 187-203). Like Dr. Kuester, Dr. Hudspath reported Plaintiff suffered from two disorders: affective disorders (12.04) and anxiety-related disorders (12.06). (Tr. 187). Taking the two disorders into account, Dr. Hudspath reported Plaintiff's degree

of limitation as to activities of daily living was "mild." (Tr. 197). Plaintiff's degree of limitation as to difficulties in maintaining social functioning was "moderate." (*Id.*). Plaintiff's deficiencies or concentration, persistence, or pace, Dr. Hudspath reported was also "moderate." (*Id.*). Finally, Dr. Hudspath reported one or two episodes of decompensation. (*Id.*).

Next, Dr. Hudspath, in determining Plaintiff's capacity assessment, evaluated Plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation in determining Plaintiff's mental residual functioning capacity. (Tr. 201-202). First, in determining Plaintiff's understanding and memory, Dr. Hudspath reported that Plaintiff was moderately limited in her ability to understand and remember detailed instructions. (Tr. 201). However, Dr. Kuester reported Plaintiff's ability to remember locations and work-like procedures and understand and remember short and simple instructions was not significantly limited. (*Id.*).

Next, in determining Plaintiff's sustained concentration and persistence, Dr. Hudspath reported that Plaintiff was not significantly limited in her ability to: carry out very short and simple instructions, perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or proximity with others without being distracted or make simple work-related decisions. (*Id.*). Additionally, Dr. Hudspath reported that Plaintiff was moderately limited in her ability to: carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday without interruption. (*Id.*). Dr. Hudspath reported no marked limitations. (*Id.*).

Third, in determining Plaintiff's ability to socially interact, Dr. Hudspath reported that Plaintiff was not significantly limited in her ability to: ask simple questions or request assistance, get along with coworkers or peers without distracting them, or maintain socially appropriate

behavior. (Tr. 202). Dr. Hudspath also reported that Plaintiff was moderately limited in her ability to: interact appropriately with the general public, accept instructions, or respond appropriately to criticism from supervisors. (*Id.*). Again, Dr. Hudspath reported no marked limitation. (*Id.*).

Finally, in determining Plaintiff's ability to adapt, Dr. Hudspath reported that Plaintiff was not significantly limited in her ability to: be aware of normal hazards or take appropriate precautions and travel in unfamiliar places or use public transportation. (*Id.*). Dr. Hudspath also reported that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting and set realistic goals and make plans independent of others. (*Id.*). Again, Dr. MacLean reported no marked limitation. (*Id.*).

On June 11, 2001, Plaintiff underwent a biopsychosocial assessment by Dr. Eckburg at Allied Behavioral Health Systems. (Tr. 229). Dr. Eckburg noted that during the evaluation Plaintiff exhibited the following symptoms: decreased energy, academic or work inhibition, antisocial behavior, social withdrawal, anxiety, panic attacks, anger, blunted or flat affect, depressed mood, loss of interest or pleasure, memory impairment, and poor attention or concentration. (Tr. 300). Dr. Eckburg noted Plaintiff's GAF score was 50, which fell into the "serious symptoms" category, but that Plaintiff's expected GAF score at discharge, Dr. Eckburg noted, was 70, which fell into the "mild symptoms" category. (Tr. 231).

About one month later, Plaintiff underwent a psychiatric evaluation with Dr. Uma Srivastava at Allied Behavioral Health Systems. (Tr. 224). Dr. Srivastava reported that Plaintiff's family psychiatric history included history of alcohol/drug abuse (on father's side), depression (father), bipolar illness (father), suicide attempts (father), and suicide (uncle). (Tr. 224). Dr. Srivastava diagnosed Plaintiff as suffering from bipolar disorder, PTSD, and depression, (tr. 227), and assigned

Plaintiff a GAF score of 60, which fell into the "moderate symptoms" category. (*Id.*).

## IV.  **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility

24

determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[8] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful

---

[8]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[9] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any

---

[9]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d

635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly

relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92

(7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy

that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not,

the claimant will be found to be disabled.


## VI.    **ANALYSIS**

The court will proceed through the five step analysis in order.

A.  Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis, the ALJ found that Plaintiff had not engaged in any

substantial gainful activity at any time relevant to his decision issued on August 17, 2001. (Tr.15 ).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the

claimant's earnings averaged more than seven hundred and eighty dollars per month for years after

January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29,

2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and

the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the

Analysis is affirmed.

B. Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe

impairments. The ALJ found "the record demonstrates the presense of 'medically determinable'

conditions that significantly limit the claimant's ability to perform basic work activity," and thus,

28

" there are 'severe' impairments." (Tr. 15).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.    Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 15-16). First, the ALJ evaluated section 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders). (Tr. 16). Turning first to §12.04, the ALJ established that "the paragraph A criteria ... is satisfied in that the record shows the claimant has a depressive syndrome characterized by: a pervasive loss of interest in almost all activities; sleep disturbance; decreased energy; feelings of guilt or worthiness; and thoughts of suicide." (*Id.*). However, as to §12.06, the ALJ stated "[a]n evaluation under section 12.06 establishes that although a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria under this section, it is substantiated by medical records which reflect a diagnosis of generalized anxiety disorder." (*Id.*).

Next, after finding the Plaintiff fulfilled Paragraph A of both §12.04 and §12.06, the ALJ determined that Plaintiff did not fulfill Paragraph B for either. (*Id.*). Specifically, the ALJ stated:

> the claimant's mental condition has resulted in the following functional limitations under Paragraph B criteria of these sections: 'moderate' restrictions of activity of daily living; 'marked' difficulties in maintaining social functioning; 'mild' difficulties in maintaining concentration, persistence or pace; and 'none' with respect to repeated episodes of decompensation, each of extended duration.

(*Id.*). Because the ALJ determined Paragraph B was not satisfied, the ALJ then turned to Paragraph

C. Looking first to §12.04, the ALJ stated:

> the paragraph C criteria of section 12.04 are not satisfied
> because the evidence does not establish that the claimant's
> affective disorder has resulted in either repeated episodes of
> decompensation, each of extended duration; or, a residual
> disease process that has resulted in such marginal adjustment
> that even a minimal increase in mental demands or change in
> environment would be predicted to cause the individual to
> decompensate; or, current history of 1 or more years' inability
> to function outside a highly supportive living arrangement with
> an indication of continued need for such an arrangement.

(*Id.*). Likewise, in §12.06, the ALJ stated none of the criteria in paragraph C are satisfied because

"the claimant's anxiety-disorder has not resulted in a **complete** inability to function independently

outside the area of one's home." (*Id.*).

Plaintiff argues that the ALJ did not properly analyze section 12.04. Specifically, Plaintiff

argues that, in addition to a finding of "marked" for difficulties in maintaining social functioning,

the ALJ should have found a finding of "marked" for difficulties in maintaining concentration,

persistence, or pace. In support of this, Plaintiff puts forward the testimonial exchange between the

psychiatric medical expert, Dr. Hoffman, and the ALJ, whereby Dr. Hoffman originally stated he

believed Plaintiff had "marked" limitation as to concentration, persistence, or pace, but later changed

his mind. Specifically, the Plaintiff states: "So here we have the requisite two categories in the B.

criteria fulfilled according to the psychiatric medical expert at hearing and the ALJ just states that

she disagrees with him!" (Pl.'s Brief in Supp. of Pl.'s Mot. for Summ. J. at 10). The Magistrate

Judge disagrees with Plaintiff assertion as to the conclusory statement made by the ALJ. While the

ALJ did disagree with Dr. Hoffman's assessment, the ALJ stated she disagree because "She

(Plaintiff) is able to function and she is able to work on the computer. There is no evidence, nor any

complaints in the file indicated she has any concentration problems. She was able to work for 20

years at a job doing – – obviously a satisfactory job. I would find her mild to moderate at best in

concentration." (Tr. 281).

The Plaintiff, in acknowledging the activities put forward by the ALJ, nonetheless argues that

the activities relied upon by the ALJ fall short of the factors set out in 12.00(C)(3). 12.00(C)(3)

states:

> *Concentration, persistence, or pace* refers to the ability to
> sustain focused attention and concentration sufficiently long to permit
> the timely and appropriate completion of tasks commonly found in
> work settings. Limitation in concentration, persistence, or pace are
> best observed in work settings, but may also be reflected by
> limitations in other settings. In addition, major limitations in this area
> can often be assessed through clinical examination or psychological
> testing. Wherever possible, however, a mental status examination or
> psychological test data should be supplemented by other available
> evidence.
>
> On mental status examination, concentration is assessed by
> tasks such as having you subtract serial evens or serial threes from
> 100. In psychological tests of intelligence or memory, concentration
> is assessed through tasks requiring short-term memory or through
> tasks that must be completed within established time limits.
>
> In work evaluations, concentration, persistence, or pace is
> assessed by testing your ability to sustain work using appropriate
> production standards, in either real or simulate work tasks (e.g. filing
> index cards, locating telephone numbers, or disassembling and
> reassembling objects). Strengths and weaknesses in area of
> concentration and attention can be discussed in terms of your ability
> to work at a consistent pace for acceptable periods of time and until
> a task is completed, and your ability to repeat sequences of action to
> achieve a goal of an objective.
>
> We must exercise great care in reaching conclusions about
> your ability or inability to complete tasks under the stresses of
> employment during a normal workday or work week based on a time-
> limited mental status examination or psychological testing by a
> clinician, or based on your ability to complete tasks in other settings

31

that re less demanding, highly structured, or more supportive. We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

We do not define 'marked' by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C)(3). The Magistrate Judge disagrees with Plaintiff's argument. First, as noted as a factor above, the Plaintiff had little trouble calculating serial sevens during her consultative examination with Dr. Best. (Tr. 145). Similarly, Dr. Srivastava's examination report reflected that Plaintiff's memory and concentration were intact. (Tr. 226). Lastly, neither Dr. MacLean, Dr. Hudspath, or Dr. Kuester found Plaintiff suffered from any marked limitations in terms of her concentration, persistence, or pace. (Tr. 154, 159, 161, 166, 197, 202-03). Although these observations occurred in a non-work setting, the regulations provide that limitations in concentration, persistence, or pace can be reflected by limitations in different settings other than work, including clinical examinations and psychological testing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C)(3).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.      Step Four: Is the claimant capable of performing work which the claimant performed in

32

the past?

Before deciding whether the Plaintiff was capable of performing past work, the ALJ needed to establish Plaintiff's RFC. In determining a mental RFC, as necessary in the instant case, the first step in the procedure is to assess the nature and extent of the claimant's mental limitations and restrictions (20 C.F.R. § 416.945 (c)). This information is then used to determine the mental RFC. In order to properly assess an individual's level of functioning due to a mental disorder, evaluation of the impairment must take into account the severity of the impairment over a period of time.(20 C.F.R. Part 404, Subpart P, Appendix 1 12.00). This information is then used to complete claimant's vocational assessment.

After considering the entire record., including Plaintiff's allegations of disabling symptoms and limitations, the ALJ concluded that the Plaintiff's RFC precluded the following work related activities: understanding; remembering and/or carrying out complex instructions; interacting with the general public more than occasionally; dealing effectively with more than low to moderate levels of stress; and working with others. (Tr. 17). The ALJ deemed Plaintiff's past relevant work, as a surgical technician, as exertionally medium and semi-skilled. (Tr. 19). Based on this assessment, the ALJ determined that Plaintiff is unable to perform any of her past relevant work because Plaintiff's least demanding past relevant job required her to perform work activities inconsistent with Plaintiff's RFC as determined by the ALJ. (*Id.*).

The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed. (*Id.* ).

E.     Step Five: Is the claimant capable of performing any work existing in substantial numbers

in the national economy?

At Step Five the ALJ determined that although Plaintiff's RFC did not allow her to perform past relevant work, there existed a significant number of jobs in the national economy that she can perform. (Tr. 20). In coming to this conclusion, the ALJ first noted that based on Plaintiff's RFC limitations, Plaintiff can perform a limited range of heavy work. (*Id.*). The ALJ then noted, if Plaintiff could perform a full range of work at the heavy work level, then Medical-Vocational Rule 204.00 ("rule 204.00") would apply and a direct finding of "not disabled" would be appropriate. However, because Plaintiff's RFC capacity limitations do not exactly coincide with those considered under rule 204.00, the ALJ concluded the rule could not be applied directly. (*Id.*). In order to determine the effect of Plaintiff's additional limitations on the occupational base of jobs contemplated under rule 204.00, the ALJ consulted vocational expert, Susan Entenberg, who stated that an individual with Plaintiff's limitations could perform a job as a packer (4,000 jobs in the Chicago metropolitan suburbs); hotel housekeeper (20,000 jobs in the Chicago metropolitan suburbs); and inspector (3,000 jobs in the Chicago metropolitan suburbs). (*Id.*). Thus, using rule 204.00 as a framework for decision-making, and in conjunction with Social Security Ruling 85-15, the ALJ concluded that there remain a significant number of jobs in the economy that Plaintiff can perform. (*Id.*). Plaintiff's medical record supports such a finding.

Looking first to a physician who actually met with Plaintiff personally, Dr. Best, a clinical psychologist of The Counseling Center, found that although Plaintiff is depressed and distressed, Dr. Best questioned "her inability to perform substantive employment." (Tr. 145). Additionally, Dr. Kuester, Dr. MacLean, and Dr. Hudspath all found, in performing summary evaluations of Plaintiff's mental RFC, that Plaintiff did not suffer from the required marked limitations to be found disabled.

34

(Tr. 147-159, 167-182, 187-203, respectively). In his report of contact, Robert Hughes stated that although Plaintiff could not perform above the level of unskilled work (which does not require sustained, appropriate, interaction with the general public, close supervision, or interaction with coworkers), Mr. Hughes nonetheless determined Plaintiff was not disabled and that a significant number of jobs exists in the economy which Plaintiff can perform. (Tr. 97). J.V. Rizzo, Ph.D., a medical consultant, like Mr. Hughes, also determined that the file evidence does not establish the presence of disabling mental limitations. (Tr. 181). These reports taken together, coupled with the fact that none of Plaintiff's treating physicians found Plaintiff disabled, provide substantial evidence to support the ALJ's findings. Thus, the Magistrate Judge will not disturb the deference given to the ALJ.

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII.  CONCLUSION

For the reasons stated on the attached memorandum opinion and order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

ENTER:

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

DATE: 2/11/03